DEBORAH J. DOPPS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dopps v. Commissioner
Docket No. 10110-92
United States Tax Court
T.C. Memo 1994-371; 1994 Tax Ct. Memo LEXIS 380; 68 T.C.M. (CCH) 326; August 4, 1994, Filed *380 Decision will be entered under Rule 155. For petitioner: John C. King. For respondent: Bruce K. Meneely. PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioner's Federal income tax for the year 1989 in the amount of $ 23,674 and for the year 1990 in the amount of $ 10,308. Respondent also determined accuracy-related penalties under section 6662(a) in the amounts of $ 1,470 and $ 2,061 for 1989 and 1990, respectively. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure. Petitioner does not contest the deficiencies in tax or the additions to tax for the years at issue. The issues to be decided are: (1) Whether petitioner filed a joint income tax return for 1989; and (2) Whether petitioner is entitled to innocent spouse relief as provided in section 6013(e) for the taxable year 1990 and, in the event we find that she filed a joint return for 1989, for the taxable year 1989. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation *381 of facts and the exhibits attached thereto are incorporated herein by this reference. At the time the petition was filed, petitioner Deborah J. Dopps resided in Wichita, Kansas. Petitioner is a licensed practical nurse (LPN) and at the time of trial was enrolled in school, seeking to become a registered nurse (RN). Prior to moving to Kansas in 1976, petitioner worked in a hospital in Iowa as an LPN and as an office nurse in a doctor's office. Her duties did not involve any matters pertaining to finances or bookkeeping. Petitioner and her former husband, Bradley E. Dopps (Dr. Dopps), were married on December 12, 1975. After she moved to Kansas and Dr. Dopps started his chiropractic practice, petitioner worked in Dr. Dopps' office for approximately 2 years. Petitioner's duties in Dr. Dopps' office included scheduling appointments, filing insurance claims, posting payments, and applying a vibrator to patients' backs. Petitioner did not write any checks for the business. Dr. Dopps handled all of the finances of the practice and wrote all of the checks for the business. After 1978 and the birth of her first child, petitioner stopped working in Dr. Dopps' office. From 1978 until *382 1990, petitioner cared for her three children and did not work outside of the home. In early 1990, after her separation from Dr. Dopps, petitioner began working for a group of doctors whose office was located in Wichita, Kansas. Each month during the marriage, Dr. Dopps gave petitioner money to pay the mortgage, automobile loan, telephone, utilities, and other household expenses. By the end of the marriage, Dr. Dopps was giving petitioner $ 5,000 each month for these household expenses. Sometimes he gave petitioner an office check made out in petitioner's name; other times he had the bank transfer funds from the office account into the joint checking account. When she received office checks, petitioner deposited them into the joint checking account, which was the only account on which petitioner had check signing authority. Petitioner did not know whether the $ 5,000 she received from Dr. Dopps each month represented all of the money Dr. Dopps earned from his practice. Although Dr. Dopps told petitioner that his practice generated $ 500,000 per year, petitioner did not know the amount of the overhead, employee salaries, or other expenses from his practice. When she asked about *383 the finances of the practice, Dr. Dopps told her that it was not any of her business. If petitioner asked Dr. Dopps for extra money, he would tell her to get a job; he did not consider caring for the home and the children to be a job. The Dopps built a house located on Maize Court in Wichita, Kansas, for $ 145,000 (the marital home). They financed the marital home through Fidelity Savings. They made improvements to the property, including a 2,000-square-foot addition with an extra fireplace and bath, a $ 30,000 gazebo, and a wrought iron fence installed around an acre of the property. Dr. Dopps told petitioner that he paid cash for the improvements. The Dopps lived very comfortably, and Dr. Dopps occasionally gave petitioner gifts of jewelry. During their marriage, the Dopps had a family membership in the Rolling Hills Country Club. Petitioner and the children used the swimming pool and often ordered lunch from the restaurant at the club. Petitioner and Dr. Dopps had dinner at the club once a week. Petitioner did not play golf. Dr. Dopps played golf at the club and often entertained business guests at the club. In 1988, the Dopps went to St. Maarten and, shortly before *384 their divorce, they went to Alaska. Dr. Dopps frequently took trips without petitioner, such as golfing in Arizona, fishing in Canada, and hunting in Colorado with his friends. Dr. Dopps did not use a checking account, but paid cash for his vacations, gasoline, dinners, and clothing. During 1989, Dr. Dopps paid for his entire office staff of 15 employees to attend a seminar in San Francisco, California. Petitioner did not go on this trip. During the last year of the marriage, petitioner discovered that, although she had not performed any services for Dr. Dopps' business since 1978, she had been on his payroll as an employee. Dr. Dopps told petitioner that he put her on the payroll so that she could obtain health insurance. Dr. Dopps kept petitioner on the payroll even after she began working for the doctors in Wichita, Kansas, in early 1990. In fact, he increased the amount of the monthly payroll checks made out to petitioner. Dr. Dopps' clinic issued payroll checks in petitioner's name totaling $ 34,828.79 in 1989, and $ 15,973.11 during the first few months of 1990. Petitioner, however, never received any of the payroll checks issued in her name. Dr. Dopps signed petitioner's *385 name on the back of the checks, cashed them, and kept the money for his own use. Shortly before they separated, petitioner found $ 12,000 in cash that Dr. Dopps had hidden in a boot in a closet. On March 12, 1990, petitioner filed a petition for separate maintenance in the District Court, Sedgwick County, Domestic Department, Kansas (the divorce court). The divorce court awarded petitioner temporary support and maintenance in the amount of $ 6,500 per month, which included child support. Petitioner continued to reside in the marital home until the divorce was final. She paid the mortgage on the house and household expenses out of the $ 6,500 temporary support. On February 6, 1991, the divorce court entered a Journal Entry of Judgment and Decree of Divorce (Case No. 90-D-915). Dr. Dopps received the marital home in the divorce settlement. Petitioner was awarded spousal support and maintenance in the amount of $ 3,500 per month for 58 months, commencing February 1, 1991. Pursuant to the property settlement agreement, Dr. Dopps and petitioner divided the marital property as listed under their respective columns as follows: Total Dr. Dopps Petitioner
Cash
$ 31,312
$ 31,243
$ 69
Advance to Dopps Assoc., Inc.
11,750
11,750
--
IRA's
44,070
24,174
19,896
Rolling Hills CC stock
3,500
3,500
--
Dean Witter stock 307-015721
2,310
2,310
--
Dopps Assoc., Inc.
--
--
--
Dopps Clinic
107,739
107,739
--
Residence
Less Mortgage
($ 146,429)
NOT VALUED
Automobiles:
FMV
Loan
1989 Lincoln
$ 19,000
$ 5,337
13,663
--
13,663
1986 Zimmer
25,000
23,523
1,477
1,477
--
1986 Jeep
5,500
--
5,500
5,500
--
1988 Jet Ski
2,700
--
2,700
2,700
--
1988 Yamaha ATV
1,500
--
1,500
1,500
--
1988 Kawasaki
ATV
1,200
--
1,200
1,200
--
Cellular phone difference
1,000
1,000
--
Home Furnishings
75,000
37,500
37,500
1989 Federal Tax Refund
5,387
2,695
2,694
1989 Kansas Tax Refund
1,807
903
904
Silver
2,000
1,000
1,000
Accounts Payable - Personal
(1,691)
(1,691)
--
1990 Tax Liability - Federal
(12,525)
(12,525)
--
1990 Tax Liability - Kansas
(1,175)
(1,175)
--
Note Payable - John Dopps
-0-
-0-
--
Subtotal
$ 295,726
$ 220,000
$ 75,726
Cash Difference
(72,137)
72,137
Total
$ 295,726
$ 147,863
$ 147,863
*386 In addition to the property listed above, Dr. Dopps received the marital home and paid petitioner an additional $ 110,000 in cash. The divorce agreement also provided that, in the event any asset or income of significant value had been omitted by one party, the other party could claim an equitable share thereof. The party failing to disclose the asset or income was liable for reasonable attorneys' fees, costs, and disbursements incurred in establishing such an omission. The divorce agreement also addressed certain tax matters. Petitioner and Dr. Dopps agreed to file a joint tax return for the taxable year 1990. Petitioner was allocated short-term capital losses in the amount of $ 9,803.43 and long-term capital losses in the amount of $ 12,852.79 carried over from 1989. [1] Dr. Dopps was allocated capital losses of $ 22,450.35 carried over from 1990. *387 Before petitioner was married, she filed her own tax returns, and she has filed her own returns since her divorce. After 1978 and up to 1990, petitioner did not have any taxable income and did not file separate returns. Dr. Dopps filed joint returns during the marriage. Petitioner did not instruct Dr. Dopps to sign her name to the joint returns he filed during the marriage. Petitioner was not aware that Dr. Dopps was signing her name to the returns. Except for the 1990 return, she did not sign or review any of the joint returns filed by Dr. Dopps. In the settlement agreement, petitioner agreed to file a joint return for the tax year 1990, and she signed the 1990 return on the advice of her divorce attorney. On April 15, 1990, shortly after the institution of the divorce proceedings, petitioner and Dr. Dopps filed a joint Form 4868, Application for Automatic Extension of Time to File U.S. Individual Income Tax Return for 1989. The 1989 income tax return was filed on May 25, 1990. The 1989 return purported to be a joint return and reflected an overpayment in the amount of $ 5,388.83. The 1989 return reported that Dr. Dopps' clinic paid petitioner $ 34,828.79 in wages and *388 claimed a deduction for a contribution to petitioner's IRA in the amount of $ 2,000. Respondent refunded the 1989 overpayment to petitioner and Dr. Dopps on June 25, 1990. Petitioner secured Dr. Dopps' signature on the refund check, cashed it, remitted half of the amount to Dr. Dopps, and retained the balance. In a letter dated May 3, 1991, the Internal Revenue Service (IRS) notified Dr. Dopps that it intended to audit the 1989 return. Dr. Dopps informed petitioner that the 1989 joint return was being audited. The audit was conducted at Dr. Dopps' office and the Wichita, Kansas, office of the IRS. At some point the audit was expanded to cover the 1990 tax year. The audit disclosed that Dr. Dopps had not reported all of his income from his practice. He failed to report $ 49,463 of income from his practice and $ 421 of interest income in 1989. In addition, Dr. Dopps overstated the business expenses that he deducted on his Schedule C by $ 24,435 in 1989 and $ 31,233 in 1990. During the audit and long before any notice of deficiency was issued, Dr. Dopps wanted petitioner to pay half of the tax liability and made repeated telephone calls to petitioner, demanding that she pay *389 half of the taxes. Petitioner finally acquiesced to Dr. Dopps' demands and, on August 26, 1991, signed an agreement whereby she agreed to pay $ 15,750 of the taxes. On August 28, 1991, Dr. Dopps made a cash bond payment in the amount of $ 26,197 to respondent on the proposed 1989 deficiency and additions to the tax, and petitioner made a cash bond payment in the amount of $ 15,750 to respondent on the proposed deficiencies for 1989 and 1990. On February 7, 1992, respondent sent a statutory notice of deficiency to petitioner and Dr. Dopps. The notice of deficiency proposed to increase the Dopps' taxable income for 1989 for omitted business income in the amount of $ 49,463, interest income in the amount of $ 421, and for disallowed business deductions in the amount of $ 24,435. The notice of deficiency proposed to increase the Dopps' taxable income for 1990 for disallowed business deductions in the amount of $ 31,233. The adjustments to specific business expenses for 1989 and 1990 were as follows: 1989
Item
Claimed Allowed Adjustment
Advertising
$ 10,236
$ 10,224
$   12 Depreciation
0
557
(557)
Legal/Professional
18,018
0
18,018 Office Expense
0
12,064
(12,064)
Repairs/Maintenance
5,395
5,340
55 Supplies
2,631
1,378
1,253 Travel
18,782
4,204
14,578 Meals/Entertainment
4,534
1,394
3,140 Dues/Subscriptions
--
--
-- Misc. Expenses
--
--
-- Total
$ 59,596
$ 35,161
$ 24,435 *390 1990
Item
Claimed Allowed Adjustment
Advertising
$ 17,003
$ 14,648
$  2,356 Depreciation
4,822
6,269
(1,447)
Legal/Professional
3,625
2,969
656 Office Expense
9,550
1,896
7,653 Repairs/Maintenance
11,234
2,776
8,458 Supplies
3,129
1,607
1,522 Travel
17,983
9,993
7,990 Meals/Entertainment
5,395
0
5,395 Dues/Subscriptions
2,208
4,302
(2,094)
Misc. Expenses
1,855
1,111
744 Total
$ 76,804
$ 45,571
$ 31,233 The explanation of adjustments stated that the deductions in the amounts claimed were not allowable in full because: it has not been established that any amount over $ 35,161.00 and $ 45,571.00, for the respective taxable years 1989 and 1990, represents ordinary and necessary business expenses or was expended for the purpose designated. Further, with regard to amounts deducted as advertising, office expense, supplies, travel & seminars, meals & entertainment, and dues & subscriptions, you have not satisfied the requirements of section 274 * * *
The omission of income and overstatements of business expenses resulted in an increase in tax in the amounts of $ 23,674 for 1989 and $ 10,308 for 1990, plus accuracy-related *391 penalties for both years. Dr. Dopps did not contest the correctness of the deficiencies and penalties. On March 25, 1992, upon petitioner's request, respondent returned petitioner's cash bond to her. Petitioner filed her petition in this Court in May of 1992. On November 10, 1992, Dr. Dopps filed suit against petitioner in District Court, Sedgwick County, Civil Department, Kansas (Case No. 92-C-2909). After protracted proceedings, that case was dismissed in July of 1993, and the matter was then somehow made part of or consolidated with the earlier divorce case (Case No. 90-D-915). In any event, Dr. Dopps filed in the divorce court a motion to compel petitioner to pay her respective share of the additional Federal and State taxes. The divorce court rendered judgment against petitioner in the amount of $ 15,750. The court held that the property settlement agreement incorporated into the divorce decree related to known assets and known liabilities and directed that all tax liabilities be shared. The divorce court held further that, subsequent to the divorce decree, the IRS and the State of Kansas assessed tax liabilities against the parties, [2] that the parties entered into *392 an agreement modifying their original property settlement agreement, whereby petitioner agreed to pay $ 15,750 of the taxes, that petitioner breached the agreement, and that Dr. Dopps was damaged in the amount of $ 15,750. Petitioner had been told by her divorce lawyer and she believed that the divorce decree could be modified only within the first year following the decree. If she had known that the divorce court would interpret the August 26, 1991, agreement as a modification of the divorce decree, petitioner would not have signed the agreement. Dr. Dopps did not file a petition in this Court seeking a redetermination of the deficiencies in income taxes and the additions to the taxes for 1989 and 1990. *393 He also did not sign a waiver of restrictions on assessment for the deficiencies and additions for those years. On March 17, 1993, respondent assessed the deficiencies in income taxes and the additions to the taxes against Dr. Dopps, individually. See supra note 2. Dr. Dopps is currently withholding $ 2,700 from the monthly spousal support and maintenance payment due petitioner under the divorce decree and has paid the withheld amounts to respondent. As of the time of the trial in this case, respondent had received the following payments and applied them to the deficiencies in income taxes and the additions to the taxes for 1989 and 1990: Date
Amount
8/28/91
$ 26,197
9/21/93
2,700
9/28/93
2,700
10/6/93
2,700
Dr. Dopps has not filed a claim for refund with respect to the 1989 and 1990 income taxes. At the time of the trial in this case, petitioner was a full-time student, working part-time, and living on $ 800 per month ($ 3,500 spousal support and maintenance less $ 2,700). She expected completion of an associate degree in nursing in May of 1994 and planned to take the board examinations for her nursing license in July of 1994. Petitioner has moved to another *394 house costing $ 80,000, and Dr. Dopps continues to live in the marital home. OPINION A. 1989 Joint Return Issue
A spouse may avoid liability for the tax owed and any additions to tax by showing that the purported joint return was not in fact joint. Whether an income tax return is a joint return depends on the intent of the spouses. The presence or absence of the signature of one spouse is not determinative. Sharwell v. Commissioner, 419 F.2d 1057, 1059 (6th Cir. 1969), vacating and remanding T.C. Memo. 1968-89; Estate of Campbell v. Commissioner, 56 T.C. 1, 12 (1971). It has long been held that where an income tax return is intended by both spouses as a joint return, the absence of the signature of one spouse does not prevent their intention from being realized. See Federbush v. Commissioner, 34 T.C. 740, 757 (1960), affd. per curiam 325 F.2d 1 (2d Cir. 1963); Kann v. Commissioner, 18 T.C. 1032, 1045 (1952), affd. 210 F.2d 247, 251 (3d Cir. 1953); Howell v. Commissioner, 10 T.C. 859, 866 (1948), *395 affd. per curiam 175 F.2d 240 (6th Cir. 1949). The determining factor is whether the spouses intended to file a joint return, their signatures being but one indication of such intent. The determination of the spouses' intentions is a question of fact. O'Connor v. Commissioner, 412 F.2d 304, 309 (2d Cir. 1969), affg. in part, revg. in part T.C. Memo. 1967-174. "This intent may be inferred from the acquiescence of the nonsigning spouse." Hennen v. Commissioner, 35 T.C. 747, 748 (1961); see also Federbush v. Commissioner, supra;Howell v. Commissioner, supra.
In this case, considering all of the facts of record, we conclude that petitioner intended to file a joint return for 1989. Subsequent to the institution of divorce proceedings, petitioner and Dr. Dopps filed a joint Form 4868, Application for Automatic Extension of Time to File U.S. Individual Income Tax Return for 1989. The Dopps' 1989 joint return was filed on May 25, 1990, reflecting an overpayment of $ 5,388.83. Dr. Dopps signed both his name and *396 petitioner's name to the joint return. Petitioner received the refund check, secured Dr. Dopps' endorsement on the check, cashed the check, remitted half of the amount to Dr. Dopps, and kept the balance. Therefore, we hold that petitioner and Dr. Dopps filed a joint return for the taxable year 1989. B. Innocent Spouse Issue
If a husband and wife file a joint return, each becomes jointly and severally liable for the tax due. Sec. 6013(d)(3). A spouse, however, may be relieved of such liability if he or she proves entitlement to innocent spouse protection under section 6013(e). To qualify for innocent spouse relief, petitioner must meet the following statutory requirements for each of the taxable years at issue: (1) petitioner and Dr. Dopps must have filed a joint return; (2) on the joint return there must have been a substantial understatement of tax; (3) the substantial understatement of tax is attributable to grossly erroneous items; (4) the grossly erroneous items are items of Dr. Dopps; (5) petitioner did not know, or have reason to know, of the substantial understatement; (6) considering all of the facts and circumstances, it would be inequitable to hold petitioner *397 liable for the deficiency attributable to the substantial understatement; and (7) if the understatement is attributable to items of deduction, the understatement must exceed a specified percentage of petitioner's preadjustment year income. Sec. 6013(e); Purcell v. Commissioner, 86 T.C. 228, 235 (1986), affd. 826 F.2d 470 (6th Cir. 1987). Petitioner has the burden of proving that she has satisfied each statutory requirement of section 6013(e). Rule 142(a). She will not qualify for innocent spouse relief if she fails to prove any one of the statutory requirements. Purcell v. Commissioner, 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986); Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 1132 (11th Cir. 1993). Respondent concedes that, in 1989 and 1990, there were substantial understatements of tax and that the understatements were attributable to items of Dr. Dopps. The parties also agree that a joint return was filed in 1990. We have held that petitioner and Dr. Dopps filed a joint *398 return for 1989. Therefore, joint returns were filed for both of the years at issue. The following issues remain in dispute: (1) whether the substantial understatements of tax are attributable to "grossly erroneous items"; (2) whether petitioner knew or had reason to know of the substantial understatements; and (3) considering all of the facts and circumstances, whether it would be inequitable to hold petitioner liable for the tax. 1. Grossly Erroneous Items
The deficiency for 1989 resulted from omitted income in the total amount of $ 49,884 and disallowed business deductions in the amount of $ 24,435. The deficiency for 1990 resulted from disallowed business deductions in the amount of $ 31,233. For purposes of section 6013(e), any item of gross income omitted from gross income is a grossly erroneous item. Sec. 6013(e)(2)(A). Respondent concedes that the income in the amount of $ 49,884 omitted from the 1989 return constitutes a "grossly erroneous item" within the meaning of section 6013(e)(2)(A). For purposes of section 6013(e), a deduction is grossly erroneous if there is no basis in fact or law for the deduction. Sec. 6013(e)(2)(B). [A] deduction has no basis *399 in fact when the expense for which the deduction is claimed was never, in fact, made. A deduction has no basis in law when the expense, even if made, does not qualify as a deductible expense under well-settled legal principles or when no substantial legal argument can be made to support its deductibility.
Douglas v. Commissioner, 86 T.C. 758, 762-763 (1986). The term "grossly erroneous items" means deductions that are fraudulent, frivolous, phony, or groundless. Purcell v. Commissioner, 826 F.2d at 475; Douglas v. Commissioner, supra at 763. Respondent disallowed expenses Dr. Dopps claimed on Schedule C in 1989 and 1990 because he had not shown that the expenses were ordinary and necessary business expenses or were otherwise properly substantiated. Petitioner argues that the transactions for which Dr. Dopps took business deductions did not take place and that his "padded" deductions should, "as a matter of law", be held to have had no basis in fact or in law. Petitioner offered no proof that the transactions did not take place or that the disallowed deductions were "padded". *400 Petitioner cannot merely rely on respondent's disallowance of a deduction as proof that the deduction is grossly erroneous. Douglas v. Commissioner,supra at 763. Petitioner argues that the disallowed deductions were personal items and, therefore, had no basis in law or in fact. Petitioner, however, offered no evidence that the disallowed expenses were personal. For example, respondent disallowed travel expenses in the amounts of $ 14,578 for 1989 and $ 7,990 for 1990. When Dr. Dopps testified at trial, he was not asked to identify or otherwise explain any of the disallowed Schedule C expenses claimed on the returns. The expenses may have been business expenses that were either not ordinary or not necessary or business expenses that were otherwise not adequately substantiated. Petitioner has not shown that the disallowed expenses, in fact, were not made or that no substantial legal argument can be made to support their deductibility. Therefore, petitioner has not proved that the deductions claimed by Dr. Dopps in 1989 and 1990 were grossly erroneous items. [3]
*401 2. Knowledge of the Understatement
If on a joint return there is a substantial understatement of tax attributable to grossly erroneous items of the taxpayer's spouse, the taxpayer seeking innocent spouse relief must establish that, in signing the return, or consenting to the filing of the joint return, as the case may be, he or she did not know, and had no reason to know, that there was such substantial understatement. Sec. 6013(e)(1)(C). Therefore, petitioner must establish that she did not know, and had no reason to know, that there was a substantial understatement of tax on the joint return. The facts in this case indicate that petitioner did not have actual knowledge of the substantial understatement of tax for either year. Although petitioner consented to the filing of the joint returns, she did not sign or see the completed return for 1989; she saw and signed the 1990 return. In determining whether petitioner had reason to know of the substantial understatements of tax, the test is whether a reasonable person, with knowledge of the facts possessed by petitioner at the time she consented to the filing of the return, should have been alerted to the possibility of *402 a substantial understatement or would infer that gross income had been omitted or erroneous deductions had been taken. Shea v. Commissioner, 780 F.2d 561, 565-566 (6th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984-310; Flynn v. Commissioner, 93 T.C. 355, 365 (1989); Terzian v. Commissioner, 72 T.C. 1164, 1170 (1979). In determining whether a spouse had reason to know of a substantial understatement of tax, courts have considered the alleged innocent spouse's level of education, his or her participation in business affairs or bookkeeping, the presence of unusual or lavish expenditures or any large, unexplained increase in the family's standard of living, and the allegedly culpable spouse's evasiveness and deceit about the family's finances. Flynn v. Commissioner, supra at 365-366. Although petitioner is educated and paid the household bills, she had no involvement in Dr. Dopps' business during the years at issue and for many years prior thereto. While the Dopps lived a comfortable lifestyle, there was never a large, *403 unexplained increase in their standard of living nor any lavish expenditures. See Dakil v. United States, 496 F.2d 431, 433 (10th Cir. 1974). Dr. Dopps testified that petitioner was an integral part of his practice, that she was an employee and performed bookkeeping services on a regular basis, and that many of her duties, such as running errands for the clinic, buying supplies for the clinic, and organizing office functions, did not require her to be in the office. He further testified that sometimes he gave her the payroll check, sometimes he deposited the check into the joint checking account, and sometimes he signed her name to the checks, cashed the checks, and used the cash for his own purposes. He claimed that petitioner consented to his signing her name to the checks and joint tax returns and blamed his accountant for the errors on his return. The Court did not find Dr. Dopps to be a credible witness and did not believe his testimony. The record establishes that petitioner did not work in Dr. Dopps' business after 1978, and that she had no knowledge of his business and financial affairs. Although petitioner did not examine the joint returns, *404 we do not think that such examination would have put her on notice that further inquiry was necessary, nor do we think that further inquiry would have alerted her to the fact that Dr. Dopps was omitting income and taking erroneous deductions for business expenses. At the time the 1989 return was filed, petitioner had separated from Dr. Dopps. She was represented in her divorce case by an attorney who advised her to sign the 1990 return. There is no indication that any of the property that petitioner received in the divorce settlement had been acquired during the years before the Court. All of the Dopps' assets were valued for purposes of the property division and spousal support. Yet, neither petitioner's divorce attorney nor the divorce court was alerted to any omissions of income or overstatement of business expenses. Under the facts and circumstances in this case, we hold that petitioner did not know and had no reason to know of the substantial understatements of tax in 1989 and 1990. 3. Inequitable to Hold Petitioner Liable
In weighing whether it would be inequitable to hold a spouse liable, we consider (1) whether the spouse claiming relief significantly benefited *405 from the grossly erroneous items attributable to the culpable spouse ( Estate of Krock v. Commissioner, 93 T.C. 672, 678 (1989)); (2) whether the spouse claiming relief has been deserted by, or divorced or separated from, the culpable spouse ( sec. 1.6013-5(b), Income Tax Regs.); and (3) probable future hardships that would be visited upon the innocent spouse if he or she is not relieved of liability ( Sanders v. United States, 509 F.2d 162, 171 n. 16 (5th Cir. 1975)). Normal support is not considered a "significant benefit". Sec. 1.6013-5(b), Income Tax Regs.; Estate of Krock v. Commissioner, supra at 678; Flynn v. Commissioner, 93 T.C. at 367. Normal support is determined by the circumstances of the parties. Estate of Krock v. Commissioner, supra at 678-679; Sanders v. United States, supra at 168; Flynn v. Commissioner, supra.
Prior to petitioner's separation from Dr. Dopps, petitioner received $ 5,000 each month from Dr. Dopps for household expenses. *406 After she separated from Dr. Dopps in 1990 and prior to the final divorce, petitioner received temporary monthly support from him in the amount of $ 6,500, which included child support. She continued to pay the mortgage and other household expenses from that amount. After the divorce court entered the decree of divorce on February 6, 1991, petitioner received monthly support and maintenance in the amount of $ 3,500. Under the circumstances, the amount she received each month during the marriage was normal support. The amount she received from the divorce court was probably less than the normal support to which she had been accustomed during the marriage. Rather than benefiting from Dr. Dopps' omission of income and overstatements of business expenses in 1989 and 1990, petitioner may well have received less support payments since he appeared to be making less income from his chiropractic practice than was the fact. Petitioner suffered another detriment in the divorce proceeding as a result of Dr. Dopps' substantial understatements of tax. Under the divorce agreement, if any asset or income of significant value had been omitted by one party, the other party could claim an equitable *407 share thereof. The party failing to disclose the asset or income was liable for reasonable attorneys' fees, costs, and disbursements incurred in establishing such an omission. Dr. Dopps substantially understated the income he received from his practice by omitting income and overstating his business expenses. Although the divorce court found that the tax liability resulting from Dr. Dopps' understatement was a marital debt, the divorce court did not increase petitioner's spousal support or otherwise compensate petitioner for the omission of that income as provided in the divorce decree. Furthermore, Dr. Dopps withheld $ 2,700 from petitioner's monthly spousal support and maintenance payments to pay the tax liabilities the IRS had assessed against him individually. See supra note 2. Petitioner received no benefit from the omission of income or the overstatements of deductions made by Dr. Dopps. The overwhelming equitable considerations require that the unnecessarily harsh attempt to collect from her individually the tax liabilities of her husband should never have been made, and, having been made, should be cast into oblivion. Even a tax collector should have some heart.
*408 Dakil v. United States, 496 F.2d 431, 433 (10th Cir. 1974). Although it would be inequitable to hold her liable for any of the understatements of tax, innocent spouse relief is available only for understatements of tax attributable to grossly erroneous items. Here, the only grossly erroneous item proved was the omitted income for the taxable year 1989. Therefore, we hold that petitioner is entitled to innocent spouse relief under section 6013(e) for 1989 for the understatement of tax attributable to the omitted income. [4]
Based *409 on the foregoing, Decision will be entered under Rule 155. Footnotes
1. These capital losses were carried over to the joint 1990 return that petitioner filed with Dr. Dopps; the capital losses allocated to Dr. Dopps were to be carried over from the 1990 return to his individual return in subsequent years.↩
2. We note that the IRS has assessed tax deficiencies only↩ against Dr. Dopps for the years 1989 and 1990. Petitioner having timely filed her petition in this Court, the IRS is prohibited from assessing any tax against her until this Court has redetermined her tax liability for 1989 and 1990. Sec. 6213(a).
3. If the understatements attributable to disallowed business expenses had been grossly erroneous items, the understatements must exceed a specified percentage of petitioner's preadjustment year income. Sec. 6013(e)(4). The preadjustment year is petitioner's most recent taxable year ending before the notice of deficiency was mailed. Sec. 6013(e)(4)(C)↩. The notice of deficiency was mailed to petitioner on February 7, 1992. Therefore, petitioner's preadjustment year for the years at issue is 1991. Petitioner attached a copy of her 1992 tax return to her opening brief. That return is an ex parte document and is not part of the evidentiary record in this case. Rule 143(b). Later she filed a Motion to Supplement the Record in an attempt to place her 1991 return in evidence. Because petitioner did not prove that the understatements attributable to the disallowed expenses were grossly erroneous items, we need not reach the preadjustment year issue, and thus petitioner's motion will be denied as moot.
4. The $ 2,700 amounts Dr. Dopps withheld from petitioner's monthly support and maintenance payment and paid over to the IRS constitute payments by petitioner. If Dr. Dopps continued such withholding and payments to IRS, the deficiencies and additions may well have been fully paid by this time. If the payments exceed petitioner's liability for tax, the computations under Rule 155 should consider whether there has been an overpayment of tax by petitioner.↩